UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA    )
                            )
v.                          )    No. 2:13-cr-166-GZS
                            )
DAVID GOYETTE,              )
                            )
       Defendant            )


### RECOMMENDED DECISION ON SECOND MOTION TO SUPPRESS

The defendant, David Goyette, has filed a motion to suppress evidence obtained as a result of premises searches in this action in which he is charged with multiple counts of distribution of cocaine base and distribution of cocaine, as well as conspiracy to distribute and possess with intent to distribute both cocaine and cocaine base, and possession with intent to distribute cocaine. Indictment (ECF No. 3). An evidentiary hearing was held before me on April 16, 2014, at which the defendant appeared with counsel. The government tendered three witnesses and five exhibits, all of which were admitted without objection. The defendant offered three exhibits, all of which were admitted without objection, and called no witnesses. An affidavit of Michael Babin was admitted without objection during a post-hearing conference as Government Exhibit 6.[1] During the teleconference, a post-hearing briefing schedule was set; post-hearing briefing was completed on May 5, 2014.[2] I recommend that the court adopt the following findings of fact and deny the motion.

---

[1] At the hearing, counsel for the defendant stated that the defendant would not object to the admission of this affidavit after the hearing, and that he would inform the court promptly if he wished to cross-examine Babin. No such request was made during the teleconference.

[2] Simultaneous reply briefs were due on May 9, 2014. ECF No. 54. The defendant filed no reply brief and the government filed an untimely reply brief on May 12, 2014, which I have, accordingly, not considered.

1

## I. Proposed Findings of Fact

On June 4, 2013, at around 3:20 p.m., agents of the Maine Drug Enforcement Agency ("MDEA"), the Auburn Police Department, and the Androscoggin Sheriff's Office secured dwellings located at 5 Bearce Street and 37 Webster Street in Auburn, Maine. They did so because the defendant had been arrested and they wanted to secure residences to which he had access before he could warn others to remove any incriminating evidence that might be in those residences. Other agents prepared an affidavit and applied for a search warrant for the two residences.

The houses are located across the street from each other. The building at 5 Bearce Street had three apartment units, one on each floor. The building at 37 Webster Street was also a multi-unit dwelling. The agents were interested in Unit 3, on the top floor of 5 Bearce Street, where the defendant's mother lived, and Unit 2 at 37 Webster Street, where the defendant lived. The agents went to the Bearce Street apartment with a ram, but the door was opened in response to their knock.

MDEA Agent Matthew Cashman helped control the dogs that were the only inhabitants of the apartment at 37 Webster Street when the agents knocked. A security sweep of each apartment was conducted and, because there were two entrances to the Bearce Street apartment, a police officer was stationed in the kitchen, where he had a view of both entrances. A crowd gathered in the street outside the buildings.

The defendant's mother asked to re-enter her apartment, the third-floor unit at Bearce Street, to get supplies for an infant, and either she or her daughter, the mother of the infant, was allowed to do so. No other requests were made for entry into either unit. The defendant's mother told the agents that there was marijuana in the pantry closet of the apartment, and some marijuana was later found there. Cashman spoke with the landlord, Michael Babin, after the buildings were

secured and before the search warrants were obtained. Babin told him to pay special attention to the third-floor hall closet and the attic crawl space at the Bearce Street building.

After the search warrants were obtained, at around 8:30 p.m., Cashman assisted in the search of the Bearce Street apartment. No search was conducted before the search warrant had been obtained. He pulled a small lock off the door of a closet next to the door of the third-floor apartment, but did not keep the lock. Another agent searched inside that closet. Cashman did see the substance that was retrieved from that closet, and he would describe it as cocaine.

John Guay, the K-9 officer for the Androscoggin County Sheriff's Office began searching with his dog for narcotics in the Bearce Street apartment shortly before 9:00 p.m., after they had waited until they were notified that a search warrant had been obtained. The dog focused on the door of the closet just outside the apartment door, after which Guay took the dog into the apartment, where crack cocaine was found in a closet after the dog alerted there. He and the dog went to the Webster Street apartment around 9:52 p.m., where the dog alerted on a safe. Only jewelry was found in the safe. The dog did not find any narcotics at the Webster Street apartment.

The affidavit submitted in support of the application for the search warrants states that a cooperating defendant stated that the defendant "pays the rent for all three apartments in" 5 Bearce Street. Govt. Exh. 2 at 9. The landlord's affidavit states that the defendant paid the rent on Apartment 3 at 5 Bearce Street "[o]n a couple of occasions during Ms. Goyette's tenancy when Ms. Goyette[3] was behind on her rent[.]" Affidavit of Michael Babin (Govt. Exh. 6) ("Babin Aff.") ¶ 4. The landlord's affidavit also reports that use of the closet in the hallway outside the front door of that apartment "is included in the rental of the respective unit" and that anyone other than the tenant could use that closet "only . . . with the permission of the third floor tenant." *Id*. ¶ 5.

---

[3] The name of the defendant's mother at the time of the search and seizure was apparently Patty Bennett. Maine Drug Enforcement Agency Supplemental Report ("Cashman Report") (Govt. Exh. 4) at 1.

3

## II. Discussion

### A. Standing

The government contends that the defendant lacks standing to seek suppression of evidence seized from Apartment 3 at 5 Bearce Street or from the locked closet just outside the front door of that apartment. The Government's Objection to Defendant's Motion to Suppress ("Opposition") (ECF No. 43) at 3. If that is the case, the court need only address the portion of the motion to suppress that addresses the jewelry found in the safe at 37 Webster Street.

A criminal defendant seeking to suppress evidence must show that he had a legitimate expectation of privacy in the area that was searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104-05 (1980). Here, the defendant does not argue that he resided in Apartment 3 at 5 Bearce Street. Rather, he appears to rely solely on the fact that he paid his mother's rent on that apartment, at least occasionally. Brief in Support of Motion to Suppress Evidence Obtained from the Third Floor Closet ("Closet Brief") (ECF No. 57) at 2.

The defendant has the burden of establishing that he had a reasonable expectation of privacy with respect to Apartment 3 and the closet. *United States v. Dent*, Criminal No. 08-11-P-S, 2008 WL 4446594, at *5 (D. Me. Sept. 26, 2008). Case law suggests that merely paying rent on a living space is not enough to establish a legitimate expectation of privacy in a particular living space, certainly not when the rent is only paid when the actual tenant falls behind on the rent.[4] *E.g., Rawlings*, 448 U.S. at 105 (no standing in absence of right to exclude others from access); *United States v. Brazel*, 102 F.3d 1120, 1147-48 (11th Cir. 1997) (no standing where defendant offered no evidence to show he was tenant or had unrestricted right of occupancy or control in apartment at time of search, paid rent only sporadically, and was arrested at house next door where

---

[4] The landlord is certainly in a better position than virtually any other witness to testify as to how often the defendant paid rent on the apartment in which the defendant's mother resided.

he lived with his grandmother; even though codefendants referred to apartment as defendant's); *United States v. DiCesare*, 908 F.2d 978 (table), 1990 WL 99477, at *4 (9th Cir. July 16, 1990) (no standing where indictment stated that defendant rented apartment searched and a utility bill found in apartment bore defendant's name, but no evidence that defendant occupied apartment, had key, paid rent, or maintained any possessions there). *Cf. United States v. Davis*, 932 F.2d 752, 757 (9th Cir. 1991) (defendant had legitimate expectation of privacy where he had key to apartment searched, stored things in apartment in locked safe, previously lived in apartment, had independent access to it, and assumed ongoing obligation to pay rent).

Here, there is no evidence that the defendant lived in Apartment 3 at 5 Bearce Street, that he had the right to exclude others from access to the apartment or the closet, that he had an unrestricted right of occupancy or control of Apartment 3 on the day of the search, that he had a key to the apartment or the closet, or that he stored possessions in the apartment.[5] Weighing these factors against the hearing record, I conclude that the defendant lacks standing to object to the search of Apartment 3 or the closet immediately outside the front door of the apartment, which was the only apartment on that floor of the building.

This conclusion makes it unnecessary to address the defendant's additional arguments that the police and agents took too long to obtain the search warrants after securing the premises, although that argument is discussed below in connection with the search of 37 Webster Street; that the search warrant for the Bearce Street apartment did not include the closet; or that the agent who

---

[5] Contrary to the defendant's assertions, I see no assertion in the government's submissions that the defendant "was the one with sole control over that closet," a statement for which the defendant provides no citation to the record, Closet Brief at 2; nor that the defendant "plac[ed] a lock on the door [of the closet] to secure his property," *id.*. a factual assertion without support in the record currently before the court. Similarly, there is no evidence to support the defendant's assertion that Cashman was told by the landlord that the defendant "himself may have had access to that closet." *Id.* at 6. Cashman only agree with counsel for the defendant, who asked whether the landlord had said that the agents should "pay particular attention to the closet" and added that the landlord also mentioned the attic crawl space. Cashman's report says that the landlord told him that "the storage closet on the third floor belonged to **BENNETT**." Cashman Report at 2 (emphasis in original).

provided the affidavit in support of the application for the search warrant was legally obligated to disclose that the closet might not have been "part of the apartment to be searched." Closet Brief at 3.

Nonetheless, the case law cited by the government persuades me that the search warrant for the Bearce Street apartment may reasonably be deemed to include the closet. The Government's Supplemental Memorandum on Defendant's Motion to Suppress Search of Unit 3, 5 Bearce Street ("Closet Opposition") (ECF No. 56) at 1-2. Thus, in *United States v. Fagan*, 577 F.3d 10 (1st Cir. 2009), officers executing a search warrant for a third-floor apartment and cellar at a particular address found while searching the apartment a key that opened the padlock on the door of a closet on a landing approximately eight feet from the apartment's front door. *Id*. at 12. The defendant sought to suppress evidence seized from the closet. The First Circuit held that

> [s]o long as the officers executing the warrant have an objectively reasonable basis, in light of the known characteristics of the location and the evidence at hand, for concluding that a structure is appurtenant to the premises specified in the search warrant, that structure may validly be searched under the purview of the warrant.

*Id.* at 13.

The defendant attempts to distinguish *Fagan* by pointing out that no key to the closet was found in this case. Closet Brief at 7. That is not determinative. The First Circuit went on to list some "helpful guideposts" for determining whether a specific structure, like a closet in a hallway, is appurtenant to an apartment to be searched pursuant to a warrant: the proximity of the structure to the described premises, the layout and the context-specific relationship between the structure and the premises specified in the warrant; and extrinsic evidence, including evidence discovered during valid portions of the search, suggesting that the closet is appurtenant to the premises specified in the warrant. *Id*. at 14. Here, the closet door was two feet from the apartment door,

6

satisfying the first guidepost. The apartment to be searched was the only residence on the third floor of the building and the closet was on the third floor, meeting the second guidepost. Finally, while no key was discovered, other "extrinsic evidence," including the landlord's statement to Cashman, strongly suggested that the closet was appurtenant to the apartment. Nothing further was necessary. *See also United States v. Principe*, 499 F.2d 1135, 1137 (1st Cir. 1974).[6]

The defendant is not entitled to suppression of evidence seized from 5 Bearce Street.

### B.  37 Webster Street

It is difficult to discern from the parties' submissions whether the seizure of the jewelry from the safe in Apartment 2 at 37 Webster Street continues to be challenged by the defendant. The defendant's initial motion complains of searches of both buildings that took place before the search warrants were issued, Motion at 4, but no evidence was presented at the hearing to support this allegation. The motion does complain of the length of time it took for the search warrant for 37 Webster Street to be obtained and executed, *id*. at 5, so I will address that argument here.

From the time that the premises at 5 Bearce and 37 Webster Streets were secured, at 3:20 p.m., until the search warrants were issued, at 8:30 p.m., Govt. Exh. 1 at 1, 3 at 1, approximately five hours elapsed. The defendant takes the position that this delay is unreasonable as a matter of law, and alone entitles him to suppression of the evidence seized from Apartment 2 at 37 Webster Street, where it is undisputed that he resided. Motion at 5. Specifically, he asserts that, because the government had been investigating him for "at least one and one half years[,]" only "perhaps

---

[6] I also reject the defendant's contention that, because Cashman's report states that the search warrant was issued at approximately 8:00 p.m., and the next sentence reports his breaking of the lock on the door of the hallway closet, he must have initiated the search "approximately 45 minutes" before the warrant was actually issued. Closet Brief at 1. The report says: "At approximately 8 PM the search warrant was issued for the Bearce St. residence. I assisted in the execution of the search warrant. – I pulled open the hallway closet door in order for a K-9 to conduct a search. (Note: I did not conduct a search of the closet)[.]" Cashman Report at 2 ¶ 8. As noted previously, other evidence establishes that the K-9 search did not begin until shortly before 9:00 p.m., so there is no evidence that any search of the closet actually took place at 8:00 p.m.

7

a tenth" of the affidavit submitted in support of the application for the search warrants concerned events that occurred on the day of the application and the previous day, and the occupants were excluded from their residences for so long,[7] the government must have drafted the affidavit "at the last minute" when it could have had it largely drafted and awaiting execution at some point much earlier. *Id*. The defendant cites no authority in support of the latter argument.

The only authority cited by the defendant in support of his assertion that the search was invalidated by excessive delay, *Segura v. United States*, 468 U.S. 796, 812 (1984), is cited for the unexceptionable proposition that a seizure that is reasonable at its inception may become unreasonable due to certain factors, including its duration. Motion at 5. More important for the instant case is the Supreme Court's immediately following statement, that a 19-hour delay in securing a search warrant that resulted in an apartment being "occupied" overnight by agents who secured it from within was not, in itself, evidence of bad faith. In the absence of any evidence that the officers purposely delayed in obtaining the warrant or exploited their presence in the apartment, and where the intrusion on the possessory interests of the occupants of the apartment was "virtually nonexistent" because the occupants were under arrest and in custody of the police, the Supreme Court was "not prepared to say under these limited circumstances that the seizure was unreasonable under the Fourth Amendment." 468 U.S. at 813. The same facts are present here.

In addition, the First Circuit has held that a delay in execution of a warrant "does not render inadmissible evidence seized, absent a showing of prejudice to the defendant[] resulting from the delay." *United States v. Syphers*, 426 F.3d 461, 469 (1st Cir. 2005). The defendant has made no such showing concerning the search of the apartment at 37 Webster Street.

---

[7] This consideration does not apply to the search warrant for the apartment at 37 Webster Street, as the only occupant of that apartment, so far as appears from the record, was the defendant, who was under arrest at the time and thus would not have been kept from that apartment by any delay in obtaining or executing the search warrant.

8

Other courts have rejected arguments similar to that made by the defendant here. In *United States v. Bigbee*, No. 3:11-000145, 2014 WL 29439 (M.D. Tenn. Jan. 3, 2014), officers secured the defendant's residence immediately after his arrest and did not apply for a search warrant for the premises until two hours and 17 minutes thereafter. *Id*. at *6-*7.[8] Construing the motion to suppress the evidence seized in the resulting search on the grounds of excessive delay as an argument based on staleness, the court found it to be without merit. *Id*. *See also Untied States v. Small*, 664 F. Supp. 1357, 1362 (N.D. Cal. 1987) (rejecting, in absence of specific evidence of bad faith, allegation that 8-hour delay in obtaining search warrant was deliberate so that late hour would discourage any rigorous examination of affidavit supporting application).

On the showing made, the defendant is not entitled to suppression of the evidence seized from 37 Webster Street.

### III. Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact be adopted and that the motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

---

[8] In the instant case, no attempt has been made to show how much of the 5-hour period was due to the preparation of the application for the search warrant, and how much was consumed by the court's review of the extensive affidavit. There has been no showing of the specific time when the application was filed with the court.

9

Dated this 28th day of May, 2014.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge